UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TUWANNA STEVENS, | **)** | |
| | **)** | |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | Case No. 1:20-CV-335-JEP |
| | **)** | |
| CABARRUS COUNTY BOARD OF | **)** | |
| EDUCATION, | **)** | |
| | **)** | |
| Defendant. | **)** | |
| | **)** | |

MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. #47]. In this case, Plaintiff, a Black woman, alleges, *inter alia*, that Defendant discriminated against her on the basis of her race when she was not promoted to the position of Cafeteria Assistant II (5.5 hour) in December 2018. Plaintiff also alleges that Defendant retaliated against her for filing charges with the Equal Employment Opportunity Commission (EEOC) when it terminated her employment in June 2019. Plaintiff alleges that both actions are in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. In response, Defendant contends that Plaintiff was not qualified for the Cafeteria Assistant II position because she had recently been disciplined for a safety violation when she left a lid containing boric acid on a dish rack with other dishes and pans, resulting in contamination in the kitchen. Defendant further contends that even if Plaintiff were qualified, it has presented legitimate non-discriminatory reasons for selecting another internal candidate, O.R., who had prior management experience, had experience successfully running the breakfast lines alone,

and could speak Spanish, allowing for communication with Spanish-speaking students and their families regarding free meal options. Finally, Defendant contends that Plaintiff's termination was not in retaliation for her filing of any EEOC charges, but rather as a result of numerous problems and violations noted by her manager, Ms. Jarrell, who was not even aware that Plaintiff had filed any EEOC charges.

Also before the Court are Defendant's Motion to Strike [Doc. #53] and Motion to Seal [Doc. #57]. Defendant seeks to strike evidentiary material submitted by Plaintiff in support of her Response to Defendant's Motion for Summary Judgment. Defendant seeks to seal portions of its exhibits provided in support of its Motion for Summary Judgment.

For the reasons set forth below, Defendant's Motion for Summary Judgment will be granted, Defendant's Motion to Strike will be granted in part and denied in part, and Defendant's Motion to Seal will be granted in part and denied in part.

I. BACKGROUND

In her Amended Complaint [Doc. #15], Plaintiff brought seven causes of action against Defendant: (1) violation of Title VII and 42 U.S.C. § 1981 based on failure to promote; (2) violation of Title VII and 42 U.S.C. § 1981 based on retaliatory discharge; (3) violation of 42 U.S.C. § 1983 for denials of her substantive due process rights; (4) violation of Title VII based on a racially hostile work environment; (5) intention infliction of emotional distress; (6) wrongful discharge in violation of public policy; and (7) violation of the North Carolina Equal Employment Practices Act. (See Am. Compl.) On January 22, 2021, the District Judge entered a Memorandum Opinion and Order dismissing Plaintiff's third, fourth, fifth, sixth, and seventh claims in their entirety. As to Count One, the District Judge dismissed Plaintiff's

2

claim under § 1981, leaving only the Title VII claim for failure to promote on Count One. Finally, as to Count Two, the District Judge dismissed Plaintiff's claim under § 1981 for retaliatory discharge, leaving only the Title VII claim for retaliatory discharge in Count Two. As such, Plaintiff's remaining claims are her Title VII claim for failure to promote and Title VII claim for retaliatory discharge.[1] Because the matter is now before the Court on Defendant's Motion for Summary Judgment, the Court sets out below the evidence in the record in the light most favorable to Plaintiff as the non-moving party, including the background information that Plaintiff contends is relevant to her claims.

Plaintiff was an employee of Cabarrus County Schools in the School Nutrition Program ("SNP") from August 2015 until June 13, 2019. Plaintiff was initially hired to work at Cox Mill High School, and her job duties involved stocking items, preparing food, and working the cash register. Plaintiff alleges that all of her supervisors and co-workers were Caucasian or Latino/Latina, and she generally alleges that she endured verbal abuse, specifically that on one occasion another co-worker called her "stupid b---h". (Stevens Decl. [Doc. #52-1] ¶¶ 2-9, 13.) Plaintiff also alleges that she was asked to help put up Christmas decorations, which she declined because of her beliefs as a Jehovah's Witness, and she was later directed to take down Christmas decorations, which she also declined. (Stevens Decl. ¶ 11.) At some point in 2016, Plaintiff caused an "anonymous letter" to be sent to the Board on her behalf complaining about Plaintiff's working environment at Cox Mill. (Stevens Decl. ¶ 12-21.) Plaintiff then met with then SNP Director, Gayle Buddenbum, who asked Plaintiff if she "was okay working at

---

[1] The parties subsequently consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636, and the matter is now before the undersigned on the present Motion for Summary Judgment.

Case 1:20-cv-00335-JEP    Document 61    Filed 09/30/22    Page 3 of 37

Cox Mill," and Plaintiff responded "No." (Stevens Decl. ¶ 21.) According to Plaintiff, after her complaint to Ms. Buddenbum, Plaintiff was asked by her supervisor at Cox Mill, Amy Hill, to come into the office, and Ms. Hill told her there was an issue with a "black rat" in her office, which Plaintiff understood to be a reference to her, due to her race. (Stevens Decl. ¶¶ 22–25.)

Soon thereafter, near the end of the 2015-2016 school year, Plaintiff was transferred to Odell Elementary School, where she was required to pack up the cafeteria and clean out sheds in preparation for the school to be demolished and rebuilt. (Stevens Decl. ¶ 30.) A few weeks later, at the beginning of the 2016-2017 school year, Plaintiff was transferred to Winkler Middle School ("Winkler"), received a pay increase, and began working under Stacy Jarrell, a different direct manager than the supervisor at her previous school. (Stevens Decl. ¶¶ 32-34.) Plaintiff remained at Winkler for three years, until she was terminated in June 2019. At Winkler, Plaintiff was responsible for working the salad bar, running a cash register, working in the dish room, and loading dishes into the dishwasher. (Stevens Decl. ¶ 35.) Plaintiff contends that at Winkler, she continued to experience verbal abuse from her white co-workers and her manager, specifically that on one occasion during the 2016-17 year, a co-worker stated that Plaintiff was "not needed at Winkler," and that on another occasion during the 2017-18 year, when she attempted to help with the dishes, a co-worker said, "b---h, I said don't touch the d--n dishes," and Plaintiff was thereafter reprimanded for the incident.[2] (Stevens Decl. ¶¶ 37-42.)

_____

[2] As Plaintiff describes this incident, she was putting away dishes when a co-worker "saw what I was doing and told me to 'stop touching the dishes.'" Plaintiff responded that she "needed to clean the dishes as huge stacks of dishes were piling up," and the co-worker "raised her voice and said "b---h, I said don't touch the d--n dishes." The manager then told Plaintiff to "get your butt in my office" and reprimanded Plaintiff. (Stevens Decl. ¶ 42.)

4

Plaintiff remained at Winkler for the 2018-2019 school year as a Cafeteria Assistant II (4-hour) and received a merit-based pay increase. (Stevens. Decl. ¶ 48.) Plaintiff filed her first EEOC charge on September 6, 2018. In this charge, Plaintiff alleged that she faced discrimination on the basis of race and religion. (See Stevens Decl. Ex. 9.) According to Plaintiff, she filed this charge after another individual was selected over her for a 5-hour position on the salad bar, and Plaintiff was reassigned to cover the salad bar but was not increased to a 5-hour position. (Stevens Decl. ¶¶ 52-54.) Plaintiff received a right to sue letter on September 26, 2018, but did not timely file suit as to this EEOC charge, as set out in the prior Order on the Motion to Dismiss.

A few weeks later, in October 2018, a chemical reaction occurred in the dish room at Winkler after the lid of a boric acid container was run through the school's dishwasher. (Stevens Decl. ¶ 61, Ex. 11; Cabading Decl. [Doc. # 58-2] ¶¶ 10–12, Ex. 1.) Plaintiff's manager Ms. Jarrell describes this incident as follows:

> On October 25, [Plaintiff] placed the top of a 30 gallon lid of a boric acid container in the dish drain, commonly referred to as the dish rack, where dirty dishes are placed that are run through the kitchen's industrial dishwasher. The dish rack contained several sheet pans and other large items that are used for cooking and preparing food. As a result, the boric acid lid was run through the dishwasher with dirty sheet pans and dishes, causing significant chemical reaction and contamination of the dishwasher and all of its contents with boric acid, a toxic chemical. . . . Due to [Plaintiff's] careless mishandling of a toxic substance, our dishes and all utensils were exposed to this toxin, requiring significant cleaning of the dishwasher and other items. . . . A cleaning supply that contained chemicals, such as boric acid, must be kept "separate from all food, equipment, dishes, utensils, linens and single use items."

(Jarrell Decl. ¶¶ 12-13.) An e-mail from Ms. Jarrell to her superior, SNP Field Supervisor Roland Cabading, on the day of the incident described the incident similarly:

5

[Plaintiff] placed the lid of the Bori[c] acid on a dish rack and told [O.R.] to run it through the dish machine. [O.R.] came into my office frantic because the dish machine was bubbling out of the bottom drain. We emptied the machine and rinsed the inside down. After a break in serving, [Plaintiff] went to the stock room to get a case of spoons and I called her name repeatedly with no response. No one else was around. She told me excuse me and walked by me. I asked her three times to come back and she continued to walk away. She went out to the line, saw there already was a case of spoons and came back to the stock room to return the case. I stood in the door way and called her name again. She walked toward me and I asked her to stop. She said excuse me and walked away again. . . . I cannot correct a potentially dangerous situation with her and she will not acknowledge me or allow me to talk to her. All I wanted to do was tell her that we cannot send a lid of a chemical through a dish machine, especially not with other dishes on the same rack as the lid.

Please help. This is getting beyond tolerable for all of us.

(Cabading Decl. Ex. 1; Stevens Decl. Ex. 11.) Field Supervisor Cabading, SNP Director Daughn Baker, and Manager Jarrell met with Plaintiff and then provided Plaintiff with a Memo of Conference noting concern regarding the mishandling of the boric acid lid and her inappropriate communication after the incident. (Jarrell Decl. Ex. 4; Stevens Decl. Ex. 14.) The letter indicated that Plaintiff placed the lid from the boric acid container on the dishrack and that the action constituted a serious safety issue. The letter also indicated that when Roland Cabading and Daughn Baker attempted to discuss the matter with Plaintiff, that Plaintiff "interjected saying [she] didn't do it." (Jarrell Decl. Ex. 4; Stevens Decl. Ex. 14.) It appears that at the time of the incident, Plaintiff disputed that she was the one who had actually run the lid through the dishwasher, but she acknowledged that she had "put the boric acid lid in the dish rack" with other dishes. (Jarrell Decl. Ex. 4; Stevens Decl. Ex. 14.) This is consistent with Plaintiff's description in her deposition in this case, that she went to the storage room as usual to get a mop and bucket to the clean the floor at her station, and poured a cup of boric acid in the bucket, and that after she scrubbed her area:

6

Q.      What did you do with the lid on the boric acid?

A.      I took the lid that was on the boric acid, because it had, like, the Dawn dishwashing liquid on the top of it, to clean it off. First, I wiped the -- the dish with a rag. I wiped off the top before even taking it to the dish room.
When I got into the dish room, because I was so close to going and ringing up the students, I just took it to the sink and rinsed it off with clear water. After rinsing it off with clear water and taking all the residue off of it, I put it in the rack and told [O.R.], "When I get back, you know, I'll run the dishes."

Q.      The rack of the dishwasher?

A.      The -- the rack -- the dishes – any dishes that was on the rack, that was my normal thing, to come back to the dish room to help get the dishes flowing
. . .
. . . . I did tell them that I did rinsed off the – that I wiped off the top and that I set the lid, after rinsing it off in the sink with clear water, in the dish drainer so that when I was – had a break to go back to the kitchen again, that I would start the dishes like normal. And it wasn't just those dishes. I would start the dishes like normal.

(Pl. Dep. at 39, 43 [Doc. #47-4 at 10, 13].) Thus, Plaintiff admitted to placing the boric acid lid in the dish rack, and also confirmed that after the incident she "did tell" Field Supervisor Cabading that she had place the boric acid lid on the dish rack.

After this incident, Manager Jarrell directed Plaintiff to sign a safety checklist that Plaintiff alleges she had previously signed on August 25, 2018. (Stevens Decl. ¶¶ 62–67.) Plaintiff signed the safety checklist on October 25, 2018, but refused to sign another copy when requested by Field Supervisor Cabading, resulting in an argument between Plaintiff and Field Supervisor Cabading. (Stevens Decl. ¶ 66.) Plaintiff ultimately signed the form on November 13, 2018 after meeting with the Assistant Superintendent for Human Resources. (Stevens Decl. ¶ 71, Ex. 8, Ex. 15.) In late October 2018, Plaintiff wrote a letter to human resources complaining about her paperwork being misplaced and her perception that she was being harassed, and she also filed a second EEOC charge generally alleging that she

experienced "harassment" in retaliation for the first charge she filed, although the evidence reflects that Manager Jarrell and Field Supervisor Cabading were not aware that she had filed an EEOC charge. (Stevens Decl. Ex. 12, Ex. 13, Jarrell Decl. ¶ 31, Cabading Decl. ¶ 23.) Plaintiff received a right to sue letter as to this EEOC charge on November 6, 2018, but did not timely file suit, as set out in the prior Order on the Motion to Dismiss.

In early November 2018, shortly after the incident with the boric acid lid, Defendant posted a job opening for a Cafeteria Assistant II (5.5-hour) position, and applications were accepted from November 16, 2018, until the position was filled. (Stevens Decl. Ex. 16 ; Jarrell Decl. ¶ 16.) This position was the same job grade as Plaintiff's position but provided an additional 1.5 hours per day. Plaintiff applied on November 15, 2018. (Stevens Decl. Ex. 17.) Plaintiff submitted a second application for the position on November 28, 2018. (Stevens Decl. Ex. 17.) On December 11, 2018, Plaintiff was invited to interview for the position at issue. (Stevens Decl. ¶¶ 78, 79.) Also on December 11, 2018, Plaintiff filed a third EEOC Charge. (Stevens Decl. Ex. 19.) In her third charge, Plaintiff alleged racial discrimination and retaliation based on a general assertion of "harassment" and specifically alleging that she had applied for the 5.5-hour position, but that a less-experienced employee had been pre-selected and was training for the position since November 7, 2018. Plaintiff interviewed for the position on December 13, 2018, but on December 18, 2018, Plaintiff was notified that she not selected for the position; her co-worker O.R. was chosen for the position. (Cabading Decl. ¶ 23; Koln Decl. ¶ 5, Ex. 1; Stevens Decl. ¶ 85.) The selection was made by Manager Jarrell and Field Supervisor Cabading. (Cabading Decl. ¶ 18, Jarrell Decl. ¶ 18.) Plaintiff contends that she was more experienced than O.R., based on Plaintiff's past work with a caterer and as a

8

food preparer at Panera, and Plaintiff also notes that she had positive performance reviews.[3] (Stevens Decl. ¶ 88-90.) In addition, despite not being selected for the position, Plaintiff contends that she was instructed to assist and train O.R. (Stevens Decl. ¶ 93.) The EEOC attempted to conciliate Plaintiff's third charge, which ultimately failed, and Plaintiff was issued a right to sue letter on January 16, 2020. (See Third EEOC Charge [Doc. #17-3].) That third EEOC charge is the basis for the failure to promote claim presently before the Court.

In February 2019, Plaintiff was directed to cover as a substitute at other schools on three dates. Field Supervisor Cabading notes that employees were regularly required to cover other schools as needed, that nine other employees also substituted at other schools in winter and spring 2019, that of those nine at least one other employee besides Plaintiff substituted on three dates, and that another of those nine actually substituted at other schools on six dates. (Cabading Decl. ¶ 31.) Plaintiff filed her fourth charge with the EEOC on February 19, 2019, complaining that this requirement that she work as a substitute at other schools was continued

---

[3] During her employment with Defendant, Plaintiff received mid-school year bench-mark evaluations and end of the school year evaluations. In Plaintiff's entry level probation evaluation dated January 20, 2016, she largely received ratings of 4 (excels) and 3 (satisfactory). (Stevens Decl. Ex. 1.) Plaintiff's end of the school year evaluation for the 2015-2016 school year reflected that she was a 2 (at standard) for most categories. (Stevens. Decl. Ex. 1.) However, she was evaluated at a 1 (below standard) in the "effective communication" category, and it was noted that "[a]lthough Tuwanna is rated at standard for respect there is room for improvement. Improvement also needs to be made in communicating with staff members and supervisor, keeping supervisor informe[d], welcoming of communication and interchange of ideas with others." (Stevens Decl. Ex. 1.) Plaintiff's mid-school year benchmark evaluation for the 2016-2017 school year, dated January 24, 2017, reflects that Plaintiff received 3 (excels) in most categories, and received a 2 (satisfactory) in "[k]nows what to do and say at the right time; maintains working relationships without arousing resentment." (Stevens Decl. Ex. 4.) Plaintiff's end of the year evaluation for the 2016-2017 school year reflects that she received 3 (above standard) and 2 (at standard) in most categories. (Stevens Decl. Ex. 4.) In January 2018, Plaintiff received a mid-year benchmark report for the 2017-2018 school year. Plaintiff's ratings in this mid-year benchmark ranged between 2 (satisfactory) and 3 (excels) in most categories. Plaintiff's end of the year evaluation for the 2017-2018 school year reflects that Plaintiff largely received 2 (at standard) ratings. (Stevens Decl. Ex. 4.) The evaluator comments on Plaintiff's 2017-2018 end of the year evaluation note that she was learning new things such as making spotlight salads, pulling food items, and doing math required for production records.

retaliation for her previously filed EEOC charges. (Stevens Decl. Ex. 23.) Plaintiff did not timely file suit on this EEOC charge, as set out in the prior Order on the Motion to Dismiss.

Plaintiff contends that in March 2019, she was harassed when she was corrected regarding how she was handling certain food purchases by special needs students, and she was then no longer allowed to handle purchases by special needs students. (Stevens Decl. ¶ 98.) Manager Jarrell also notes that Plaintiff had several other work performance issues in early 2019, including serving incorrect portion sizes of salsa, putting salads in the freezer resulting in them being discarded, failing to place the newest milk in the back of the container on multiple occasions resulting in numerous out-of-date cartons being discarded, thawing excessive amounts of meat resulting in the excess being discarded, frequently bickering and debating with co-workers over job duties and recipes, and requiring re-training on basic recipes and food temperatures. (Jarrell Decl. ¶ 21.) Plaintiff's mid-year benchmark evaluation for the 2018-2019 school year noted that Plaintiff was evaluated as a 1 (needs improvement) in the following categories, among others: willing to work with others; accepts the responsibility for other duties as assigned; accepts extra assignment in a professional matter; knows what to do and say at the right time; maintains working relationships without arousing resentment; is courteous friendly and works successfully with students, staff, and parents, gaining their support and cooperation and assist in creating an inviting atmosphere for customers; works well with principals, teachers, manager, and/or staff; and works in cooperation with others and gives evidence of being a good team worker. (Jarrell Decl. Ex. 8.) The evaluation noted that Plaintiff "frequently has disagreements with co-workers and the manager," "often argues about assignments and states the manager should do them herself," and "frequently argues

10

with the method shown by the Manager; insists on doing it her way." (Jarrell Decl. Ex. 8.) The evaluation also makes multiple references to the boric acid incident, and notes that Plaintiff "[d]oes not complete duties in allotted time" and "[n]eeds frequent re-training." (Jarrell Decl. Ex. 8.) On March 18, 2019, Plaintiff wrote a letter acknowledging that she had reviewed her 2018-2019 Benchmark evaluation and complaining of "public humiliation" because Manager Jarrell corrected her in front of others regarding the incident related to purchases by special needs students, and because if Plaintiff asked questions Manager Jarrell would ask someone else to help her. (Koln Decl. Ex. 2; Jarrell Decl. Ex. 8.)

On April 8, 2019, Plaintiff received a memo from SNP Director Stefanie Almond following up on the March 2019 conversations regarding Plaintiff's performance. (Stevens Decl. Ex. 26; Jarrell Decl. Ex. 9.) The memo outlined performance concerns and stated that Plaintiff's behavior violated Cabarrus County Schools' Board Policy Code: 7300 Staff Responsibilities and 7205 Standards of Professional Conduct. Following receipt of the April 8 Memo, Plaintiff was placed on a Performance Improvement Plain ("PIP"). (Stevens Decl. ¶ 109, Ex. 28 , Ex. 29; Pl. Dep. at 73; Jarrell Decl. ¶ 25-27, Ex. 10; Cabading Decl. Ex. 3.) As a part of this plan, Plaintiff was given performance-related goals to meet and steps to attain those goals. Plaintiff was also set to attend regularly scheduled formal conferences regarding her PIP.

On May 16, 2019, Plaintiff received a letter summarizing a formal conference that was conducted on May 15, 2019 with respect to her action plan evaluation. (Stevens Decl. Ex. 31; Jarrell Decl. ¶ 28, Ex. 11.) The letter advised that Plaintiff had not met the standard on three of her five goals and outlined specific instances of Plaintiff's poor performance which included

11

communication issues with repeated requests and "increased agitation and demands" to Manager Jarrell on May 13, 2019, failure to follow instructions of Manager Jarrell, and a violation of chemical and sanitation procedures by using degreaser instead of sanitizer as observed by Manager Jarrell. (Stevens Decl. Ex. 31.) In response to the letter, Plaintiff expressed that she felt she was respectful to all co-workers and that she was consistently harassed. (Stevens Decl. Ex. 31.)

Plaintiff received another action plan evaluation on May 30, 2019. This evaluation reflected that Plaintiff had failed to meet the standard on all five of her goals. The written summary of the conference included the following examples:

> • Errors or unclear information on Production Records on 5/17/19, 5/21/19, and 5/22/19.
> • Negative and disrespectful communication with your manager and co-workers. On 5/22/19, your manager [Jarrell] addressed incorrect rotation of milk crates with you. You ignored her the first time and gave a disrespectful reply the second time. On 5/24/19, your manger [Jarrell] pointed out dried food on the pans next to your workstation and asked you to clean them. You gave a disrespectful response. On 5/28/19, your manager [Jarrell] observed you give a disrespectful reply to a co-worker.
> • Not following manager directives consistently. The milk crates in your milk box were rotated incorrectly on 5/22/19 and 5/24/19. On 5/23/19, you worked over, causing you to exceed your allotted work hours.
> • Not following recipes by not having ham thawed in time for the day on 5/17/19. Manager [Jarrell] observed you throwing away ham on the same day.
> • Not following sanitation procedures on 5/17/19 by leaving dropped ham on freezer floor and not cleaning up the area to prevent contamination and falls.

(Stevens Decl. Ex. 33; Jarrell Decl. ¶ 29-30; Ex. 12.) In response to this, Plaintiff noted that she felt she was "being discriminated against" and that she had not had any confrontation with any co-workers. (Stevens Decl. Ex. 32, Ex. 33.)

Plaintiff's 2018-2019 end of the year evaluation reflects that Plaintiff received a 1 (below standard) in all matters except attendance. (Stevens Decl. Ex. 35.) The evaluator

12

comments note that "[Plaintiff] frequently has disagreements with co-workers and the manager. She continues to clock out late and refuses to acknowledge directives by the manager or second in charge. [Plaintiff] requires guidelines to be explained to her on a continual basis." (Stevens Decl. Ex. 35.) Plaintiff noted on that evaluation that her evaluations had been up to standard prior to that school year and that she was being unfairly evaluated. (Stevens Decl. Ex. 35.)

Plaintiff was ultimately terminated on June 13, 2019. Plaintiff's termination letter states that she was terminated for actions that violate Cabarrus County Schools' Board Policies 7300 Staff Responsibilities and 7205 Standards of Professional Conduct. The letter indicated that Plaintiff's "behavior and methods of communication continue to be both inappropriate and unprofessional." (Stevens Decl. Ex. 36.) The termination letter also references the conferences and written memos Plaintiff had received from November 2018 through May 2019 regarding her performance that year. (Stevens Decl. Ex. 36.) Plaintiff filed a fifth EEOC charge on June 5, 2019, complaining of continued retaliation after the filing of her previous four EEOC charges. (Stevens Decl. Ex. 34.) On June 13, 2019, Plaintiff filed her sixth EEOC charge, complaining that she was terminated in retaliation for her previously-filed EEOC charges. (Stevens Decl. Ex. 37.) As noted in the prior Order on the Motion to Dismiss, Plaintiff did not timely file suit as to either of these EEOC charges.

Defendant now moves for summary judgment on Plaintiff's remaining claims. With respect to Plaintiff's failure to promote claim, Defendant argues that there is "no direct evidence of discrimination" and that "Plaintiff cannot make out a prima facie case of discriminatory failure to promote since Plaintiff was not qualified for the position due to her

13

recent safety violation; the Board had legitimate, non-discriminatory reasons for selecting the candidate it did; and Plaintiff has not adduced evidence to support a claim that the Board's reasons were pretextual." (Def.'s Mot. For Sum. J. [Doc. #47] at 2.) With respect to Plaintiff's claim for retaliatory discharge, Defendant contends that "[t]he undisputed facts reveal that Plaintiff was terminated for legitimate non-discriminatory reasons, including Plaintiff's failure to follow requirements for chemical handling, food safety, recipes, and food handling."[4] (Def.'s Mot. For Sum. J. at 2.) Plaintiff contends that there is sufficient evidence in the record to show that since the filing of her first EEOC charge in September 2018, she was subjected to material adverse employment actions that were ultimately used to set her up for a pretextual termination. (Pl. Resp. [Doc. #52] at 20.) Plaintiff also argues that evidence in the record exists that demonstrates that Plaintiff's experience qualified her for the Cafeteria Assistant II (5.5-hour) position and that a less-qualified candidate was hired which create a genuine issue of material facts that precludes summary judgment. (Pl. Resp. at 22.)

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

[4] Defendant argues in the alternative that Plaintiff's suit with regard to retaliatory discharge is untimely. However, as the District Judge has previously held in this case on the Motion to Dismiss, a plaintiff may generally raise a retaliation claim based on the filing of a timely EEOC charge for the first time in federal court, as long as the claim is "related to" and "gr[ew] out" of the EEOC charge while the charge remained pending." (See Mem. Op. & Order at 24 n.11 (citing Brown v. Runyon, 139 F.3d 888 (4th Cir. 1998).) Here, Plaintiff alleged that she was terminated in retaliation for filing her EEOC charges and she was terminated during the pendency of the third charge. The District Judge determined that Plaintiff's retaliatory discharge claim in the present action was not time-barred. (Mem. Op. & Order at 24 n.11.) To the extent Defendant seeks reconsideration of that decision, or further analysis of that issue based on the evidence now in the record, the Court need not reach that alternative argument because Plaintiff has failed to present a genuine issue of material fact in support of the claim and it is therefore subject to dismissal in any event as discussed above.

and that the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Id. at 255. The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must then present specific facts demonstrating a genuine issue of material fact which requires trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When making a summary judgment determination, the court must view the evidence and draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); see also Anderson, 477 U.S. at 248-49. Moreover, a mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (citing Anderson, 477 U.S. at 248).

A. Title VII Claim For Discriminatory Failure To Promote

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer will be

held liable under this provision if "a protected characteristic [is] a 'motivating factor' in an employment decision." E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 773 (2015) (quoting 42 U.S.C. § 2000e-2(m)). To defeat a motion for summary judgment on a racial discrimination claim, a plaintiff can present direct or circumstantial evidence raising a genuine issue of material fact as to whether race motivated the employer's adverse employment action or, alternatively, can proceed under the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Stewart v. Morgan State Univ., 606 F. App'x 48, 49 (4th Cir. 2015); see also Tabor v. Freightliner of Cleveland, LLC, 388 F. App'x 321, 322 (4th Cir. 2010); Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). Here, Plaintiff has presented no direct or circumstantial evidence of racial discrimination, and admits that she does not have any direct evidence that she was not selected because of her race. (Pl. Dep. at 52.). Plaintiff generally alleges that she was subject to "harassment" and "verbal abuse," but her specific allegations reflect only isolated instances of non-race-related disagreements with co-workers and corrections by Manager Jarrell on work-related procedures and issues.[5] The Court will therefore presume she intends to proceed under the burden-shifting framework.

Utilizing the McDonnell Douglas framework, to establish a prima facie failure-to-promote discrimination claim based on her race under Title VII, a plaintiff must demonstrate that she (1) belongs to a protected class; (2) she applied for a specific position; (3) she was

---

[5] The Court notes that Plaintiff has provided contested evidence regarding an instance in which she felt she was being referred to as a "black rat" by a supervisor, Amy Hill, in March 2016 at Cox Mill High School. However, that incident occurred three years earlier at a different school, and the supervisor Plaintiff identified as being responsible for that alleged incident was not employed at Defendant's Winkler school location, and Plaintiff does not contend that Ms. Hill was involved in any way with the interview or subsequent promotion decision at issue.

16

qualified for that position; and (4) the employer rejected her for that position under circumstances giving rise to an inference of unlawful discrimination. Walton v. Harker, 33 F.4th 165, 176 (4th Cir. 2022) (citing Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004)). If a plaintiff can make this showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the employer meets its burden, the plaintiff then has the opportunity to establish that the employer's articulated reason is actually a pretext for discrimination. Id. at 804.

Defendant does not contest that the first two elements of Plaintiff's prima facie case have been met—that she is a member of a protected class and that she applied for the position at issue. Defendant does argue, however, that Plaintiff cannot establish the third element—that she was qualified for the position. According to Defendant, Plaintiff was not qualified for the position because at the time of her application, Plaintiff's "severe safety violations with the boric acid incident, and her reaction to the incident, indicated she did not have general knowledge of use or care of food preparations equipment or food safety." (Def.'s Mem. in Supp. of Mot. for Sum. J. [Doc. #48] at 15.) On this point, in response, Plaintiff contends that "Defendant falsely blamed the boric acid incident on [her] looking for a reason not to promote her to the Cafeteria Assistant II position" and that "Defendant's selectee, was responsible for the boric acid incident." (Pl.'s Resp. at 22.) However, even under Plaintiff's version of events as set out in her deposition, she removed the boric acid lid from the supply closet because it had dish detergent on it, she took it to the sink in the dish room and rinsed it off, and then she left it on the dish rack with other dishes to be washed. (Pl. Dep. at 39, 43.)

17

Even if she did not herself run it through the dishwasher, she left it with baking dishes in the dish room, resulting it in being placed in the dishwasher and causing significant safety concerns. In addition, the record further reflects that when Manager Jarrell, and later Field Supervisor Cabading, attempted to speak to her about the incident, she refused to accept responsibility for any error and reacted disrespectfully. The description of this incident is essentially consistent in Plaintiff's deposition, in Manager Jarrell's Declaration, in Field Supervisor Cabading's Declaration, and in the contemporaneous emails and letters from the time of the incident. The only contrary evidence is in Plaintiff's Declaration prepared in response to the Motion for Summary Judgment, in which Plaintiff admits that the boric acid lid got blue detergent on it and that she took it to the dish room to rinse the blue detergent, but she now asserts that she did not leave it by the dishwasher, and: "From my information and belief, I instead placed the lid to this bucket in the storage room, as I had done many times before." (Stevens Decl. ¶¶ 59, 60.) However, as noted by Defendant, Plaintiff cannot use a self-serving affidavit to directly contradict her own description from her deposition in order to manufacture a genuine issue of material fact. See In re Family Dollar FLSA Litigation, 637 F.3d 508, 512-13 (4th Cir. 2011); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."); Jiminez v. All American Rathskeller, Inc., 503 F.3d 247 ("A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant."). This is particularly true here, where Plaintiff now alleges her own conduct on "information and belief," which is a pleading

18

standard, not a basis for a factual assertion as to her own conduct.   See, e.g., Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002) ("Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, "upon information and belief"—instead of only knowledge—from raising genuine issues of fact sufficient to defeat summary judgment." (collecting cases)).   Therefore, based on the actual evidence in the record, including Plaintiff's own description of the incident in her deposition, there is no genuine dispute that Plaintiff placed the lid to the boric acid on the dishrack and that Defendant considered that action, in itself, a safety violation, and Plaintiff was therefore subject to discipline that was considered in the promotion decision.[6]  Based on this incident, Defendant reasonably contends that Plaintiff has not shown that she was qualified for the position.

Moreover, Defendant further argues that even if Plaintiff were qualified, it has presented a legitimate non-discriminatory reason for the promotion decision because Plaintiff had recently been involved in the boric acid incident and because O.R. had retail management experience, experience running the breakfast line alone, and the ability to communicate with Spanish-speaking students and families.   Plaintiff argues that her experience in the food services industry qualified her for the position, and that O.R. was less qualified, that Defendant blamed Plaintiff for the boric acid incident to create a pre-textual reason to not promote her,

---

[6] To the extent Plaintiff contends that O.R. should also have been disciplined because she was the one who actually ran the dishwasher with the boric acid lid after Plaintiff left it on the dish rack, Manager Jarrell and Field Supervisor Cabading determined that the safety risk was created when Plaintiff placed the boric acid lid in the dish rack with the baking dishes.  Ultimately, it is not for the Court to determine the appropriateness of Defendant's employee-discipline related decisions. "We do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (quoting DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998)). Moreover, the evidence is undisputed that Manager Jarrell and Field Supervisor Cabading believed that Plaintiff had engaged in this safety violation and believed that she acted disrespectfully when they attempted to discuss it with her.  Mr. Cabading affirms that it was Plaintiff's reaction to the chemical spill that demonstrated that she did not have the necessary knowledge of safety requirements.

19

and that Defendant constantly changed her performance standards. (Pl.'s Resp. [Doc. #52] at 22-23.)

The record reflects that Plaintiff was one of six applicants for the Cafeteria Assistant II (5.5-hour) position and was selected for an in-person interview. The interview panel consisted of three SNP Managers, including Manager Jarrell, as well as Field Director Roland Cabading. (Jarrell Decl. ¶ 18.) The job posting reflects that the requirements for the position included "general knowledge of U.S.D.A. rules and regulations" and "[s]kill in the use of standardized recipes and specialized kitchen utensils and equipment." (Stevens Decl. Ex. 16.) Plaintiff's co-worker O.R. was offered the position. Defendant has presented evidence that O.R. "was selected because she had significant experience in food service as well as experience as an assistant manager in retail" and she "spoke Spanish and could communicate with the significant portion of the student population at Winkler Middle School who speak Spanish as their primary language." (Cabading Decl. ¶ 19.) The evidence also reflects that Field Supervisor Cabading had personally observed O.R.'s strong work-ethic and problem-solving skills and that she demonstrated additional value by working with Spanish-speaking families to get students signed up for free and reduced-price lunch and by encouraging students to attend school breakfast. (Cabading Dec. ¶ 19.) Manager Jarrell further notes that O.R. had "demonstrated that she could run the breakfast program independently without constant supervision, had experience as an assistant manager in retail which skills were transferrable, had demonstrated her ability to follow recipes and comply with other SNP requirements, and spoke Spanish (which is the first language of many children at Winkler Middle School)." (Jarrell Decl. ¶ 19.) Further Ms. Jarrell explained that O.R. "did not have any safety or health

20

counselings at or near the time of her application." (Jarrell Decl. ¶ 20.) In this regard, Defendant again notes that "[a] key factor why Plaintiff was not selected for the position was the October 2019 boric acid incident, which occurred only a few weeks prior to Plaintiff applying for the position." (Def.'s Mem. in Supp. of Mot. Sum. J. at 6.) Moreover, even apart from the boric acid incident, Defendant has presented multiple reasons as to why O.R. was selected for the position, including her retail management experience, her ability to handle the breakfast line alone, and her ability to communicate with the Spanish-speaking population. In response, Plaintiff does not contend that O.R. did not have retail management experience, that O.R. had not handled breakfast alone, or that O.R. could not communicate with the Spanish-speaking students and families. Instead, Plaintiff contests the consideration of these factors at all, arguing that these factors were just a pretext for discrimination. Plaintiff argues that she "had worked in the food services industry for over 20 years having previously worked as a Catering Chef for a catering business" and that the standards for food handling and preparation that she undertook while working at Panera were "similar, if not identical, to the standards used by Defendant." (Pl.'s Resp. at 23.) However, Field Supervisor Cabading notes that they "did not consider [Plaintiff's] experience at Panera Bread to be particularly relevant." (Cabading Decl. ¶ 21.)

In addressing subjectivity in hiring decisions, the Fourth Circuit has held that

Obviously it must be possible for employers legally to make employment decisions that disfavor qualified minority employees on the basis of a comparative evaluation of their qualifications with those of other applicants. Concededly, when that evaluation is to any degree subjective and when the evaluators are themselves not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision may be subject to particularly close scrutiny by the trial judge. But, as the Supreme Court pointed out in <u>McDonnell Douglas</u> itself, the mere fact that subjective criteria

21

> are involved in the reason articulated by an employer does not prevent according it sufficient rebuttal weight to dispel the inference of discrimination raised by the prima facie case.

Page v. Bolger, 645 F.2d 227, 230 (4th Cir. 1981) (citing McDonnell Douglas, 411 U.S. at 803).

Similarly, this Court has held that "[s]ubjective criteria may be used in assessing an employee's eligibility for promotion" and that "[t]he subjective nature of the criteria alone does not render the criteria invalid." Chapman v. Lorillard Tobacco Co., 342 F. Supp. 2d 383, 390-91 (M.D.N.C. 2004); see also McCarthney v. Griffin-Spalding Cnty. Bd. of Educ.,791 F.2d 1549, 1552 (11th Cir. 1986) (holding that "Title VII does not require an employer to hire or promote the most qualified applicant; it only requires that the employer make such decisions without regard to race, sex, religion, color, or national origin."); Ousley v. McDonald, 648 F. App'x 346, 349 (4th Cir. 2016) ("When evaluating pretext, it is not within [the Court's] purview to question whether the employer's proffered basis for the disputed action 'was wise, fair, or even correct, . . . so long as it truly was the reason for' the action." (quoting Laing v. Fed. Express Corp., 703 F.3d 713, 722 (4th Cir. 2013)).

In the instant matter, although Defendant used some subjective evaluations of Plaintiff's qualifications and the selectee's qualifications to reach a hiring decision, Plaintiff has failed to articulate how such evaluations were false or were a pretext for race discrimination. Plaintiff has failed to show that she was more qualified for the promotion than O.R., or that between her and Defendant's explanation, that race was the more likely reason for her failure to be promoted. "While a Title VII plaintiff may present direct or indirect evidence to support her claim of discrimination, unsupported speculation is insufficient." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). In this regard, Plaintiff's self-

Case 1:20-cv-00335-JEP   Document 61   Filed 09/30/22   Page 22 of 37

assessment of her own abilities is insufficient to establish pretext or intentional discrimination. Id. at 959-60 ("[Plaintiff's] unsubstantiated allegations and bald assertions concerning her own qualifications and the shortcomings of her co-workers fail to disprove [defendant's] explanation or show discrimination.").

Finally, Plaintiff also argues that she observed O.R. being trained for the position prior to the interviews, reflecting that the panel had no intention of promoting Plaintiff. (Pl.'s Resp. at 13.) Plaintiff's argument suggests that it is her belief that O.R. was "pre-selected" for the position. However, the Fourth Circuit has clearly stated that preselection, absent proof of racial animus, does not violate Title VII. See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 271 (4th Cir. 2005) (holding that preselection of an employee for a promotion is not sufficient evidence for a reasonable jury to conclude that defendants' explanation was pretext for discrimination); see also Weaks v. N. Carolina Dep't of Transp., 761 F. Supp. 2d 289, 306 (M.D.N.C. 2011). Thus, while pre-selection may establish that an employee was "unfairly treated, it does not by itself prove racial discrimination." Anderson, 406 F.3d at 271 (quoting Blue v. United States Dep't of the Army, 914 F.2d 525, 541 (4th Cir.1990)).

In sum, Defendant has proffered a legitimate, non-discriminatory reason for promoting O.R., which Plaintiff has not rebutted. Viewing the evidence in the light most favorable to Plaintiff, there is insufficient evidence to create a genuine issue of material fact on Plaintiff's claim that Defendant did not promote her to the Cafeteria Assistant II (5.5-hour) position her because of her race. Accordingly, to the extent Plaintiff claims she was not selected for the Cafeteria Assistant II (5.5 hour) position because of her race, such claim does

23

not survive Defendant's summary judgment motion. As such, Defendant's motion with respect to Plaintiff's failure to promote claim will be granted.[7]

## B. Title VII Claim for Retaliatory Discharge

Plaintiff also brings a claim for retaliatory discharge under Title VII. Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment, . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3 (West); see also DeMasters v. Carilon Clinic, 796 F.3d 409, 416-17 (4th Cir. 2015) ("Title VII forbids employment discrimination based on 'race, color, religion, sex, or national origin,' 42 U.S.C. § 2000e–2(a), and its anti-retaliation provision serves to prevent [ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.") (internal quotation omitted).

Like a Title VII disparate treatment claim, a plaintiff may establish a Title VII retaliation claim by presenting direct or circumstantial evidence of retaliation or, alternatively, by proceeding under the McDonnell Douglas framework. See Foster v. Univ. of Maryland-E.

---

[7] Plaintiff also argues that she was not promoted in retaliation for her prior EEOC charges. However, Plaintiff has failed to present any evidence to support such a claim. The evidence is undisputed that at the time of the promotion decision, neither Manager Jarrell nor Field Supervisor Cabading had any knowledge of Plaintiff's prior EEOC charges. Plaintiff failed to undertake discovery or present evidence on this issue, and Plaintiff cannot establish a prima facie claim of retaliation when the decisionmakers had no knowledge of the protected activity. Moreover, Defendant has presented legitimate non-discriminatory and non-retaliatory reasons for the decision to promote O.R., as set out at length above, and Plaintiff has failed to present any evidence or basis to establish that those reasons were false or were simply a pretext for race discrimination or retaliation.

The Court also notes that because Plaintiff has not presented any evidence to support her race discrimination claims, she has also failed to present any evidence to support those claims under § 1981, even of those § 1981 claims had not previously been dismissed.

Shore, 787 F.3d 243, 249 (4th Cir. 2015). To establish a claim for retaliatory discharge under Title VII, a plaintiff must establish (1) engagement in a protected activity; (2) materially adverse employment action; and (3) a causal link between the protected activity and the employment action. Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 122 (4th Cir. 2021); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61-68 (2006) (redefining the second element to be a "materially adverse action" instead of an "adverse employment action").

In the instant matter, the Parties do not quarrel over the first two elements—engagement in protective activity and materially adverse employment action. The record demonstrates that Plaintiff filed EEOC Charges, and the parties do not dispute that the filing of an EEOC charge is protected activity. See Jefferies v. UNC Reg'l Physicians Pediatrics, 392 F. Supp. 3d 620, 629 (M.D.N.C. 2019). Further, neither party disputes that discharge from employment is a form of adverse employment action. Roberts, 998 F.3d at 123. Accordingly, the only element at issue with respect to Plaintiff's prima facie case is the causal link between Plaintiff's protected activity and termination. See Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998).

"[T]o establish the necessary causation for a retaliation claim, the employer must have taken the adverse employment action because the plaintiff engaged in a protected activity." Perkins v. Int'l Paper Co., 936 F.3d 196, 214 (4th Cir. 2019) (internal quotation and citation omitted). While a plaintiff is not required to show that "their protected activities were but-for causes of the adverse action," the plaintiff must make some showing of causation. Id. In the present case, Defendant argues that "no facts support a causal link between [Plaintiff's] protected activity and [her] termination. (Def.'s Mem. in Supp. of Mot. Sum. J. at 18.)

25

According to Defendant, Plaintiff has not presented any evidence that the decisionmakers had knowledge of Plaintiff's EEOC claims. (Def.'s Mem. in Supp. of Mot. Sum. J. at 18 (citing Jarrell Decl. ¶ 31).) Plaintiff counters that the temporal proximity of the filing of her EEOC charges is sufficient to demonstrate the element of causation. (Pl.'s Resp. at 20-21.) However, Plaintiff has not presented any evidence that a decisionmaker in the termination recommendation had knowledge of her protected activity. The Fourth Circuit has held that proof that a plaintiff "was fired after her employer became aware that she had filed a discrimination charge . . . certainly satisfies the less onerous burden of making a prima facie case of causality." Williams, 871 F.2d at 457. However, "addressing the causation prong of a prima facie case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity." Roberts, 998 F.3d at 125; see also Causey v. Balog, 162 F.3d. 795, 803-04 (4th Cir. 1998) ("Knowledge of a charge is essential to a retaliation claim."). Manager Jarrell, who was responsible for placing Plaintiff on her Personal Improvement Plan, disclaims any knowledge of Plaintiff's EEOC filings until after this lawsuit was filed, and no evidence in the record contradicts her denial. (Jarrell Decl. ¶ 31.) Plaintiff admits that she did not tell Manager Jarrell or anyone else that she had filed her EEOC charges; she states that she "assumed that the EEOC contacted Cabarrus County and then therefore, because of my filing, Stacy was informed," (Pl. Dep. at 41:10-25.) However, Plaintiff's burden "requires more evidence than mere curious timing coupled with speculative theories about discussions between a decisionmaker and someone with knowledge of the plaintiff's protected activity that create only a speculative inference

26

regarding the decisionmaker's awareness." <u>Roberts</u>, 998 F.3d at 126 (internal citations and quotations omitted).

Moreover, even if Plaintiff could establish a prima facie case, Defendant has provided legitimate, non-discriminatory and non-retaliatory reasons for Plaintiff's termination. Evidence in the record demonstrates well-documented performance deficiencies.[8]  In addition to the safety violation involving the boric acid lid, Plaintiff's 2018-2019 mid-year benchmark is replete with "needs improvement" ratings and reflects emphasis on Plaintiff's interaction with staff.  Plaintiff received a (1) "needs improvement rating" for: is courteous, friendly, and works successfully with students, staff, and parents, gaining their support and cooperation and assist in creating an inviting atmosphere for customers, works well with principals, teachers, manager, and/or staff.  With respect to personal qualities, the comments note that Plaintiff engages in:

- Frequent arguments with co-workers and manager
- Frequently refuses to do a task, such as clock out or find an error on the meal summary
- Often argues about assignments and states the manager should do them herself . . .
- Frequently argues with the method shown by the Manager; insists on doing it her way, regardless of extra time or effort involved
- Failure to understand the concept of teamwork as evidenced by continuing to work on a task after manager has instructed the hand-off to a co-worker (salads)

---

[8] The record reflects notes of concern with Plaintiff's work performance as early as her end of year evaluation for the 2015-2016 school year.  Plaintiff's 2015-2016 end of the year evaluations notes that she was "at standard" for a majority of categories, and "below standard" for the "communication category."  (<u>See</u> Stevens Decl. Ex. 1.)  Plaintiff's evaluation notes that she "does not welcome or encourage communication and interchange of ideas with others."  Further, the evaluator comments specifically state "[a]lthough [Plaintiff] is rated at standard for respect there is room for improvement.  Improvement also needs to be made in communicating with staff members and supervisor, keeping supervisor informe[d], welcoming of communication and interchange of ideas with others."

The record further shows that a memo dated April 8, 2019, addressed Plaintiff's below standard performance, and Plaintiff was placed on a performance improvement plan and warned of the potential for termination if she made no improvements in her performance. Plaintiff received another action plan evaluation on May 30, 2019. This evaluation reflected that Plaintiff had failed to meet the standard on all five of her goals. The written summary of the conference included the following examples:

• Errors or unclear information on Production Records on 5/17/19, 5/21/19, and 5/22/19.
• Negative and disrespectful communication with your manager and co-workers. On 5/22/19, your manager [Jarrell] addressed incorrect rotation of milk crates with you. You ignored her the first time and gave a disrespectful reply the second time. On 5/24/19, your manger [Jarrell] pointed out dried food on the pans next to your workstation and asked you to clean them. You gave a disrespectful response. On 5/28/19, your manager [Jarrell] observed you give a disrespectful reply to a co-worker.
• Not following manager directives consistently. The milk crates in your milk box were rotated incorrectly on 5/22/19 and 5/24/19. On 5/23/19, you worked over, causing you to exceed your allotted work hours.
• Not following recipes by not having ham thawed in time for the day on 5/17/19. Manager [Jarrell] observed you throwing away ham on the same day.
• Not following sanitation procedures on 5/17/19 by leaving dropped ham on freezer floor and not cleaning up the area to prevent contamination and falls.

(Stevens Decl. Ex. 33.) These concerns were again noted in Plaintiff's termination letter, which reflects that she was terminated for actions that violate Cabarrus County Schools' Board Policies 7300 Staff Responsibilities and 7205 Standards of Professional Conduct. The letter indicates that Plaintiff's "behavior and methods of communication continue to be both inappropriate and unprofessional." (Stevens Decl. Ex. 36.) The termination letter also references the conferences and written memos Plaintiff had received from November 2018 through May 2019 regarding her performance that year. (Stevens Decl. Ex. 36.) Plaintiff has

failed to produce any evidence from which a reasonable factfinder could conclude that Defendant's stated basis for her discharge was not, in fact, the reason she was fired.

Plaintiff contends that Defendant undertook ongoing actions to set her up for termination. Plaintiff's subjective belief, however, is insufficient to create a triable issue of fact on this point. See Stewart v. Morgan State Univ., 606 F. App'x 48, 49 (4th Cir. 2015) (citing Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 135 (4th Cir. 2002) for the proposition that "subjective beliefs about discrimination are insufficient to create a genuine issue of material fact as to any discriminatory conduct on [employer's] part" (internal quotation omitted)). The record establishes that her supervisors repeatedly addressed specific errors found in her work and concerns with her ability to get along with co-workers and managers. Plaintiff attempts to generally dispute whether she was properly trained or given false evaluative scores to set her up for termination. However,

> "'when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410–11 (7th Cir. 1997)); see also id. ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." (internal quotation marks and citations omitted)).

Allen v. Fed. Exp. Corp., No. 1:09CV17, 2011 WL 1260225, at *12 (M.D.N.C. Mar. 31, 2011). Ultimately, Plaintiff has not presented any evidence that the performance issues cited by Defendant were untrue or were a pretext for retaliation and discrimination.

Reviewing the record in the light most favorable to Plaintiff reveals that there is no evidence to create a genuine issue of material fact as to whether there was a causal connection

29

between Plaintiff's protected activity and her termination. Further, there is no evidence in the record to create a genuine issue of material fact as to whether Defendant's legitimate reasons for termination were pretextual. Thus, summary judgment is appropriate as to Plaintiff's retaliation claim.[9]

## III. DEFENDANT'S MOTION TO STRIKE

Defendant has also moved to strike certain evidentiary material submitted by Plaintiff in support of her opposition to Defendant's Motion for Summary Judgment. Defendant contends that Exhibits 2, 3, 24, 42, and 43 to Plaintiff's Response brief should be stricken. Defendant argues that these filings are "immaterial, irrelevant, and Plaintiff failed to produce them during discovery." (Motion to Strike at 1.) Defendant further argues that Plaintiff's Declaration "should be stricken as it is a sham declaration, which directly contradicts Plaintiff's sworn deposition testimony, and it is rife with irrelevant assertions." (Mot. to Strike at 1.) Plaintiff has not filed a response to the Motion to Strike, and therefore, under Local Rule 7.3(k), it is considered as an uncontested motion, which "ordinarily will be granted without further notice."

---

[9] The Court notes that Plaintiff may also be contending that her placement as a substitute on three occasions in February 2019 was in retaliation for her EEOC charge. However, the evidence reflects that employees were called upon to cover absences at other schools, that nine employees were called upon to substitute during the winter and spring of 2019, and that at least two other employees were called to substitute as many or more times than Plaintiff. (Cabading Decl. ¶ 31.) In the circumstances, Plaintiff has not presented any evidence that being called to substitute was an adverse employment action or was in any way causally related to her filing an EEOC charge. Plaintiff also may be contending that her negative employee evaluations in 2019 were in retaliation for filing her EEOC charge. However, those employee evaluations were all based on job performance issues involving and identified by Manager Jarrell. As noted above, the evidence in the record reflects that Manager Jarrell was not aware of any of Plaintiff's EEOC charges, and Plaintiff has not presented any evidence to the contrary. Ultimately, Plaintiff has not presented any evidence to support her claim that the negative evaluations and job performance plans were caused by or in any way related to the filing of her EEOC charges.

30

To the extent Defendant contends that Plaintiff's declaration should be stricken as a "sham declaration" that is "rife with irrelevant assertions," and that certain Exhibits should be stricken because they are irrelevant or immaterial, the Court notes that under Local Rule 7.6:

> Rather than filing a motion to strike, a party may assert evidentiary objections in its response or reply memorandum to factual allegations contained in memoranda or replies supporting or opposing motions to dismiss, motions for summary judgment, and other motions. . . If a separate motion to strike is filed asserting evidentiary objections, the motion to strike may be summarily denied by the Court, and any issues instead addressed in the ruling on the underlying motion.

Therefore, on these issues, the Motion to Strike will be denied, and Defendant's contentions have been considered in addressing the Motion for Summary Judgment, as set out above.

However, a failure to produce documents in discovery raises separate concerns. Here, Plaintiff has attempted to present documents in support of her claims, specifically Exhibits 2, 3, 42, and 43, that Defendant contends were not produced during discovery. Under Federal Rule of Civil Procedure 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Plaintiff has not filed any response to the Motion to Strike to contest whether the documents were provided or whether the failure was substantially justified or harmless. Given Plaintiff's lack of response to the Motion to Strike, the Court takes it as uncontested that Plaintiff failed to produce these documents during discovery and that the failure was not substantially justified or harmless. Therefore, the Motion to Strike Plaintiff's Declaration Exhibits 2, 3, 42, and 43 will be granted under Rule 37(a) to the extent that Plaintiff is "not allowed to use that information to . . . supply evidence on a motion," and those

31

documents have not been considered.[10]  However, Plaintiff's Declaration Exhibit 24 is also included with Defendant's documents (Koln Decl. Ex. 2 [Doc. #58-3 at 28]; Jarrell Decl. Ex. 8 [Doc. #58-1 at 58]) and therefore will not be stricken.

Therefore, the Motion to Strike will be granted in part and denied in part, as set out herein.

## IV.  DEFENDANT'S MOTION TO SEAL

Defendant has filed a Motion to Seal [Doc. #57], seeking to seal portions of the exhibits supporting its motion for summary judgment.  The public right of access to judicial records finds its basis in both the common law and the First Amendment. See Rushford v. The New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir.1988). With respect to the documents and information at issue in the present case, the Fourth Circuit has "squarely held that the First Amendment right of access attaches to materials filed in connection with a summary judgment motion." Doe v. Public Citizen, 749 F.3d 246, 267 (4th Cir. 2014) (citing Rushford, 846 F.2d at 252–53).  When the First Amendment is implicated, the court may grant a motion to seal only upon a showing of a compelling interest, and only if the sealing is narrowly tailored to serve that interest. See Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004). "A district court must [ ] weigh the appropriate competing interests under the following procedure: it must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific supporting findings)

---

[10] Even if the Court did consider these documents, they would not change the determination set out above on the Motion for Summary Judgment.

for its decision and the reasons for rejecting alternatives to sealing." Id. at 576; see also Fernandez Gonzalez v. Cuccinelli, 985 F.3d 357 (4th Cir. 2021). ("To seal a document, the district court must (1) give the public adequate notice of a request to seal and a reasonable opportunity to challenge it, (2) consider less drastic alternatives to sealing, and (3) if it decides to seal, state the reasons, supported by specific findings, behind its decision and the reasons for rejecting alternatives to sealing.").

Here, Defendant's Motion to Seal was publicly docketed on November 18, 2021. Interested parties have therefore had a reasonable amount of time to contest the sealing of the information at issue, although no party has done so. Accordingly, the notice requirement has been met. See Hunter v. Town of Mocksville, 961 F. Supp. 2d 803, 806 (M.D.N.C. 2013) (finding "public notice" requirement met where motion to seal had been publicly docketed for one month). In its Motion to Seal, Defendant seeks to file under seal:

(1) The job application of the individual selected for the December 2018 5.5-hour position. This job application appears as Exhibit 2 to the Declaration of Roland Cabading [Doc. #47-2, Ex. 2].

(2) The names of specific individuals in its Memorandum of Law in Support of Motion for Summary Judgment [Doc. #48] and Reply in Support of Summary Judgment [Doc. #55].

(3) References to the names of specific individuals in the Declaration of Stacy Jarrell [Doc. #47-1] as well as in Exhibits 1, 2, 4, 5, 8, 11, and 12 to that Declaration.

(4) Signatures of individual employees in Exhibits 3, 8, 9, 10, 11 to Stacy Jarrell's Declaration.

(5) Phone numbers and e-mail addresses in Plaintiff's job application (Exhibit 7 of Stacy Jarrell's Declaration), which includes contact information for Plaintiff's references.

(6) References to the names and contact information of specific employees in the Declaration of Roland Cabading [Doc. #47-2] as well as in Exhibits 1, 2, and 4 of that Declaration.

(7) References to the names of specific individuals in the Declaration of Kecia Koln [Doc. #47-3] as well as in Exhibits 1 and 3 of her Declaration.

(8) Signature, phone number, and e-mail address of Defendant's employees in Exhibit 3 of Kecia Koln's Declaration.

33

(9)     References to the names of specific individuals and their contact information in the excerpts from the Deposition of Plaintiff [Doc. #47-4] as well as in Exhibits 3, 4, 8, 11, and 12 of the Deposition Excerpts.

(10)    Social security number, e-mail address and phone number for Plaintiff in Exhibit 2 to the Deposition excerpts (job application for Cabarrus Charter Academy).

(11)    Signatures of the Board's employees in Exhibits 6, 7, 8, and 12 to the Deposition Excerpts.

(12)    Phone number of Plaintiff in Exhibit 20 to the Deposition Excerpts (EEOC Charge).

The items Defendant wishes to seal essentially fall into two categories: (1) confidential personnel information regarding non-party employees and/or job applicants and (2) private contact information for individuals.

The Court notes that the personal information of third parties is often subject to protection, given the privacy interests at stake for individuals who are not part of the suit. See Adjabeng, 2018 WL 459851 at *2 ("Courts have recognized the privacy interests of non-parties against the First Amendment right of access." (citing Robinson v. Bowser, No. 1:12CV301, 2013 WL 3791770, at *3–4 (M.D.N.C. July 19, 2013) (collecting cases)). Personal information of third parties includes third party personnel information. See, e.g., Shamblin v. Obama for Am., No. 8:13-cv-2428-T-33TBM, 2014 WL 6611006 (M.D. Fla. Nov. 21, 2014) (noting that an order to seal was required for personal identifying information of third parties who had not consented to disclosure of their personal information); see also Robinson v. Bowser, No. 1:12CV301, 2013 WL 3791770, at *6 (M.D.N.C. July 19, 2013) (holding that the protection of "personnel and otherwise sensitive information of other non-parties outweighed the First Amendment right of access."). With respect to this personal information of third parties, the Court must engage in the requisite balancing, considering the public's right of access to judicial records and the need to prevent the potential misuse of documents filed with the Court,

34

including, as in this case, documents detailing the personnel records of non-party individuals and personal contact information of all individuals. Defendant further notes that in this case, the personnel records are protected under North Carolina General Statute § 160A-168, which further reflects a strong interest in nondisclosure. Thus, the Court will find that such information should remain under seal. This includes personnel records of individuals other than Plaintiff, including the name of and application of Plaintiff's co-worker who was selected for the promotion (Exhibit 2 to the Cabading Declaration) and the names of the other applicants for the position (Exhibit 1 to Koln Declaration), as well as social security numbers, phone numbers, email addresses and other contact information for Plaintiff and for any other individuals. However, the identity of Plaintiff's managers and supervisors should not be redacted, nor should any of Plaintiff's personnel information be sealed, since Plaintiff has put that information at issue by proceeding with this case, and on balance the public right of access would outweigh any remaining privacy interests in Plaintiff's own personnel records and information except as specifically noted here.

Likewise, the information used by the Court in making its determination was included in this Opinion to the extent necessary to explain the Court's reasoning to the Parties and to the public and as to that information, the public's right to the access of judicial records outweighs any individual privacy interests. See Qayumi v. Duke Univ., No. 1:16-CV-1038, 2018 WL 2025664, at *3 (M.D.N.C. May 1, 2018) (noting that "[t]he judiciary's legitimacy depends on the public's confidence in its fair and transparent adjudication of disputes" and holding that documents which "were important in establishing the timeline and nature of actions taken and not taken…which was the central issue at summary judgment… should not

35

remain sealed"); <u>Adjabeng v. GlaxoSmithKline, LLC</u>, No. 1:12-CV-568, 2014 WL 459851, at *2 (M.D.N.C. Feb. 5, 2014) ("Balancing [privacy] interests with the First Amendment right of access, the Court will not seal information [that] … is necessary and appropriate to explain on the record why [such] accusations do not warrant a trial…" and "is central to the disposition of some of [Plaintiff's] claims").

Therefore, the Court will grant the motion to seal in part, but notes that some of the information presently filed in a sealed format [Docs. # 58, 58-1, 58-2, 58-3, 58-4, 59, 60], only appear publicly as essentially completely redacted documents [Docs. #47-1, 47-2, 47-3]. This complete redaction is not narrowly tailored. To the extent that these documents contain personal contact information of any individual (social security number, email addresses, home addresses, phone numbers, etc.) that information may be redacted. Similarly, to the extent those documents contain the identity of and application of Plaintiff's co-worker O.R., or the names of other individuals who applied for the promotion, that application and those names may be redacted. However, by bringing this case, Plaintiff placed her personnel file into question and presented it for consideration by the Court. As such, her personnel file related to employment with Defendant shall not be sealed in its entirety, but only to the extent set out above.

Thus, the Court find that the Motion to Seal will be granted, but the sealing can be more narrowly tailored. Therefore, Defendant shall redact the specified information, but must publicly file the readacted documents within 14 days. If Defendant seeks further consideration as to a specific document, name, or piece of information, Defendant may redact that

36

information and file a contemporaneous Motion to Seal so that the specific item can be further considered.

## V. CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment [Doc. #47] is GRANTED, and Judgment will be entered in Defendant's favor dismissing this case.

IT IS FURTHER ORDERED that Defendant's Motion to Strike [Doc. #53] is GRANTED IN PART AND DENIED as set out herein.

IT IS FURTHER ORDERED that Defendant's Motion to Seal [Doc. #57] is GRANTED IN PART AND DENIED IN PART, and Defendant shall file more narrowly-tailored public redacted versions in accordance with the instructions set forth in this Order within 14 days of the entry of this Memorandum Opinion and Order.

This, the 30th day of September, 2022.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge